[L. A. No. 25958. In Bank. Jan. 20, 1961.]

JAMES C. MONROE, Petitioner, v. THE STATE BAR OF
CALIFORNIA, Respondent.

146

Morris Lavine for Petitioner.

Garrett H. Elmore for Respondent.

THE COURT.—Petitioner, James C. Monroe, who is 41 years old, was admitted to practice in 1950 and at all times herein mentioned was a partner in the law firm of Monroe & Chula in Santa Ana. A local administrative committee found him guilty of alleged acts of unprofessional conduct, and the Board of Governors of The State Bar adopted the findings of the local committee with a minor amendment. This proceeding was brought to review the board's recommendation that petitioner be suspended from the practice of law for a period of nine months.

The four matters giving rise to this proceeding were consolidated at the hearings before the local committee. Peti-

tioner contends that he was denied due process of law in that the notice to show cause did not give him proper notice of the offenses which he was found to have committed. This contention was raised for the first time in a brief filed after oral argument, and we find it to be without merit. With respect to the Brown matter, to be discussed later, petitioner relies on the fact that the notice charges that he received funds belonging to the client and failed to forward them to the client, whereas the evidence shows that he was given a check and that he did not receive the proceeds. In the Calleros matter he points out that the notice charged that upon settlement of a personal injury action, petitioner retained $900 to be used for the payment of doctor bills incurred by the client, whereas the proof was that he handled only the sum of $400. In both instances, the transaction was sufficiently described, and the variance was not material. The record indicates that petitioner was afforded ample opportunity to present evidence. Hearings were held in December 1958 and January 1959 (four full days and three half days), findings were made, and the matters were referred to the Board of Governors. Thereafter the matter was reopened for further evidence at petitioner's request, additional hearings were held in November and December 1959, and the prior findings were adopted with a few modifications.

### Brown Matter

In 1954 Arthur Brown employed petitioner on a contingent fee basis to bring an action to recover damages for injuries to person and property suffered as the result of an automobile accident. Brown's insurance carrier, Aetna Insurance Company, paid him $243.39, representing the costs of repair to his car less $50 which was deductible under a provision of the policy. Joseph Rank, an attorney for Aetna, then made arrangements whereby petitioner, for a contingent fee, was to protect Aetna's subrogation rights and Rank was to receive as his fee a percentage of the recovery which would amount to $27.04.

In May 1956 judgment, limited to recovery for property damage, was entered in favor of Brown in the amount of $293.39 plus $27.95 costs. A check for $321.34, in satisfaction of the judgment, was made payable to Brown and to petitioner's law firm, and was transmitted by a letter dated May 28, 1956. Of this amount Brown was entitled to only $77.95 (the costs which he had advanced plus the $50 deductible he had paid), and Aetna was entitled to $162.26 (the amount it

had paid less attorneys' fees). Petitioner endorsed this check on behalf of his law firm and instructed a clerk to have Brown sign it. Instead the clerk gave the check to Brown, who negotiated it about June 7, 1956, and kept the entire proceeds.

On May 28, 1956, and July 10, 1956, Rank wrote Monroe & Chula inquiring about the status of the case but received no reply. After being advised by the clerk of the court that judgment had been entered and satisfied in May 1956, Rank on January 28, 1957, wrote Monroe & Chula demanding payment of Aetna's share of the recovery and of his share of the attorneys' fees. He wrote again on February 18, 1957, requesting an immediate reply. Petitioner then sent Rank three checks in the following amounts: $100.00, $62.26, and $27.04. Rank deposited the latter check in his bank account and received credit for payment. He endorsed the two other checks and sent them to Aetna. The drawee bank returned them with the notation "Signature Irregular." In April 1957, Rank advised petitioner of the dishonor and requested that payment in the amount of $162.26 be made by a cashier's check. He received neither the requested check nor any other remittance in payment of the claimed sum.

Miss Kay Cantrell, petitioner's secretary, testified that in April 1957, pursuant to petitioner's instructions to purchase money orders for $162.26 and send them to Aetna, she addressed an envelope to Aetna, enclosed a letter of transmittal signed by her for petitioner,[1] affixed adequate postage, withdrew $165 from the petty cash box and gave it, together with the letter and envelope, to Eldon White, whom she directed to purchase money orders made out to Aetna, put them in the envelope containing the letter and mail it; later the same day White returned with two money order stubs in the amounts of $100 and $63, and she put them in the safe.

White's testimony was in substance as follows: About April 20, 1957, he was given $165 cash by Miss Cantrell, who asked him to purchase a money order for $163, enclose it in a stamped envelope she gave him which contained no letter, and mail it. She instructed him to have the money order made out to the name on the envelope, which was addressed "in care

---

[1] Petitioner claims this letter was lost by the preliminary investigating committee. It was stipulated that one member of the committee had no recollection of the letter, that the second did not specifically remember it, but that the third member did recall it and had made a note reading "Feb. 1, 1957—S'DLY containing money orders" below which was written "Aetna Insurance Company." The date in the note presents an ambiguity; if it indicates the date of the letter, then the letter was written almost three weeks before the dishonored checks were sent.

of Aetna Life Insurance Company." At the post office he was told money orders were usually sold in denominations up to $100, and he purchased two money orders, one for $100 and the other for $63, both made out to cash (because he was unable to decide whether the money was to go to Aetna or to the person whose name appeared on the envelope). He had himself listed as the purchaser but gave the law firm's address, and he put the money orders in the envelope and mailed it. There was "nothing in the envelope other than the two money orders." He returned the money order stubs to Miss Cantrell and left the stubs and change on a railing by her desk.

Nearly a year later, on March 14, 1958, Frank Hyland, a representative of Aetna, wrote to petitioner, referring to the fact that the checks had been "returned" and stating that the San Francisco office had requested that "we get together and clear up this matter." No reference was made in the letter to the money orders, and it does not appear that it was answered or that Aetna ever received payment.

It is clear from the evidence that, although repeated inquiry was made on behalf of Aetna, petitioner failed for over eight months (between June 1956 and February 1957) to report the receipt of the check given in satisfaction of the judgment or to disclose what became of it. When petitioner received the letter from Hyland and saw that it contained no mention of the money orders, he should have understood the money orders had not been received by Aetna. Petitioner was attorney for both Brown and Aetna, and the check represented funds which belonged in part to Aetna. Rule 9 of the Rules of Professional Conduct provides in part: "A member of the State Bar . . . shall promptly report to the client the receipt by him of all money and other property belonging to such client." (Rules of Professional Conduct, 33 Cal.2d 30; 47 Cal.2d 10.) This rule was violated by petitioner. The evidence also supports the finding of the board that petitioner failed to make good the dishonored checks.

### Calleros Matter

Petitioner undertook to represent Fortino Calleros, who had sustained injuries while a passenger on a bus. Dr. Joseph Root, who had treated Calleros, presented a bill for $400 for his services, and it was orally agreed between petitioner and Dr. Root that if the Calleros action was compromised, Dr. Root would reduce his bill to $200. Petitioner turned the case over to his law partner, George Chula, who associated attorney James Ackerman. In May 1955, during

trial, the action was settled for $6,000, out of which petitioner's law firm paid Calleros $3,100 as his share of the recovery. It was agreed that Dr. Root's bill would be paid by the law firm out of the money it held and that if his bill was compromised for less than $400, any saving would be paid to Calleros. A few days after receipt of the $6,000, petitioner deposited $400 in a trustee account. Dr. Root died shortly after the settlement, and his practice, together with the accounts receivable, was sold to Dr. Bruce Wilton, who attempted unsuccessfully to collect the $400 from Monroe & Chula.

Petitioner told a collector employed by Dr. Wilton that the case was being handled by Ackerman and that he would check with Ackerman and let the collector know if Ackerman held any funds with which to pay the Root bill. He did not communicate with the collector as promised.

Several times after settlement of the action in May 1955, Calleros requested to be informed about the payment of the bill and was told by petitioner that he was attempting to secure a reduction of the charge and that any balance not used for its payment would be given to Calleros. Petitioner states in his brief that the bill has since been settled for $200, but it does not appear when this occurred or whether the balance, which should have been refunded to Calleros, was paid to him. The matter was pending for several years, and, while some delay may have been necessary to obtain reduction of the bill, petitioner, of course, was under a duty to make a prompt accounting and settlement with his client once the bill was paid.

### Velarde Matter

 A car, owned by Camilo Velarde and his daughter, Antonia, was involved in an accident while being driven by Louis Alatore and carrying as passengers Corinne Ramirez, Antonia Velarde, and an unidentified Mexican national. The driver of the other car brought suit against Alatore, Velarde, and Antonia. Only Antonia and her father were served. Antonia retained petitioner to defend her and her father, and she paid him $125. No appearance was made in court on their behalf on June 6, 1956, the date set for trial, and judgment was entered against them in the amount of $957.74.

Petitioner testified that on the night before the trial or the next morning he was informed that Corinne would not testify, and he thereupon contacted opposing counsel and agreed to the entry of a default judgment. There is no evidence that he

discussed the taking of the judgment with Antonia or her father, but he testified that Antonia had previously said the matter could go as a default and had indicated a willingness to pay if the car and her father's house were not taken. He stated that he told a secretary in his office to notify Antonia that a default would be entered, and Miss Cantrell testified she informed Antonia on the morning of June 6, 1956, in petitioner's office that a default was to be taken.

Antonia testified that she and her father went to petitioner's office on the morning of June 6, 1956, and were told by his secretary that petitioner was in Long Beach on a criminal case and that their trial would be postponed. The first notice she had of the judgment against her and her father was when execution was levied on their car in July 1957. Her testimony is corroborated by a letter, to which petitioner's name was signed by someone in his office, advising Antonia that her trial had been scheduled for July 6, 1956. This letter, which was dated June 6, 1956, and postmarked 6:30 p. m. on that day, was misaddressed, returned to petitioner, and remained unopened for several years.

The levy that had been made on the car was subsequently released through petitioner's efforts, but on January 10, 1958, execution was levied on Velarde's home. On January 24, 1958, Antonia gave petitioner a check for $1,026 to satisfy the judgment and obtain a release of the property. The check was cashed, and the proceeds placed in the Velarde file in petitioner's office safe. He then told a collection agent for the judgment creditor that his clients could not raise the money, and it was agreed that the creditor would settle for payment of $500 immediately and $200 a month until a total of $900 was paid. Shortly afterward, Antonia, anxious because the property was not released from the levy, called the collector's attorney and informed him she had given petitioner the money with which to satisfy the judgment. The collector then called petitioner, rescinded the agreement and demanded immediate satisfaction of the judgment in full, plus additional costs incurred as a result of the levy. Petitioner paid these sums.

The evidence supports Antonia's version of what occurred and the finding of the board that petitioner violated his duties as an attorney. In *Foote* v. *State Bar*, 37 Cal.2d 127 [230 P.2d 617], the attorney, retained to contest a will, dismissed the contest without authority of his clients but led them to believe a hearing was to be held on a specified future date. Although the attorney's conduct in that case destroyed his clients' claims, we pointed out that even if the clients suffered

no loss, the attorney could not escape disciplinary action. (37 Cal.2d at p. 129.) The record also shows that petitioner failed to promptly pay the proceeds of Antonia's check to the judgment creditor or deposit them in a trustee account. (Rules of Professional Conduct, rule 9, 47 Cal.2d 10.)

### Beltran Matter

■ J. T. Fortner, represented by attorney Otis Babcock, obtained a judgment and a writ of possession against Adolph Beltran and his wife and was about to have the writ executed. The Beltrans employed petitioner to obtain a stay of execution and to assist them in refinancing the property involved.

A stay agreement was thereafter reached by the attorneys and executed by the parties. It recited that the Beltrans had a deposit with petitioner's law firm and provided that if they should fail to refinance the property by a certain date, they would pay Fortner the sum of $200 "out of the said *moneys deposited* with the Law Firm of Monroe & Chula." (Italics added.) The agreement further recited that the Beltrans had executed their order on the law firm to pay Fortner the money in accordance with the conditions agreed upon. The Beltrans then delivered to petitioner a check for $200, payable in blank, which they asked him to hold. This check was never cashed. Although the property was not refinanced, petitioner failed to deliver the check to Babcock or Fortner, and he advised them his clients forbade him to do so. Fortner subsequently sued petitioner, Chula, and the Beltrans, and obtained a default judgment agaist all of them which remained unsatisfied at the time of the hearings.

Petitioner states he made no representation to Babcock as to the manner in which the $200 deposit was to be made, but the agreement contemplated a money deposit, and Babcock testified that the understanding between him and petitioner was that money, not a check, was to be deposited. Although the agreement was originally drawn by Babcock, changes were made by petitioner, who obviously intended it to be acted upon by Babcock and Fortner, and he must therefore be charged with knowledge of its contents. According to the terms of the agreement, petitioner should have received money from the Beltrans, and by forwarding the executed agreement to Babcock, petitioner deceived him into believing that cash had been received and was being held in escrow by petitioner's law firm. Intentionally deceiving opposing counsel is ground for disciplinary action. (*Coviello* v. *State Bar,* 45 Cal.2d 57, 65-66 [286 P.2d 357].)

## Conclusion

The record shows that petitioner violated his oath in the several respects discussed above and supports the discipline recommended by The State Bar.

It is ordered that petitioner be suspended from the practice of law for a period of nine months, commencing 30 days after the filing of this opinion.

Lillie, J. pro tem.,* participated in place of McComb, J., who deemed himself disqualified.

Petitioner's application for a rehearing was denied February 15, 1961. Lillie, J. pro tem.,* participated therein in place of McComb, J., who deemed himself disqualified.

*Assigned by Chairman of Judicial Council.