Earle E. AUSHERMAN, et al.

v.

BANK OF AMERICA CORPORATION, et al.

No. CIV.A. MJG–01–CV–438.

United States District Court, D. Maryland.

July 23, 2002.

Rodney R. Sweetland, III, Washington, DC, for plaintiff.

Dennis P. McGlone, Brian L. Moffet, Gordon Feinblatt Rothman Hoffberger and Hollander LLC, Baltimore, MD, Ava E. Lias Booker, Karl Joseph Nelson, David E. Ralph, Jennifer B. Speargas, Saul Ewing, LLP, Baltimore, MD, for defendant.

## MEMORANDUM AND ORDER *

GRIMM, United States Magistrate Judge.

On May 28, 2002, this Court ordered Plaintiffs' counsel, Rodney R. Sweetland, III, to show cause why monetary sanctions, pursuant to Fed.R.Civ.P. 37(b),[1] should not be imposed against him and/or his clients in connection with his failure to provide complete and non-evasive answers to ten interrogatories that he had been directed personally to answer by a previous court order. Paper No. 106.[2] Whether sanctions should be imposed is now ripe for resolution.[3] In this memorandum, I

---

* Exhibits referred to herein have not been included for publication.

1. Hereinafter, references to the Federal Rules of Civil Procedure will be cited as "Rule" and references to the Federal Rules of Evidence as "Evid. Rule."

2. This order was inadvertently docketed as Paper No. 98 and Paper No. 106; only Paper No. 106 will be referred to.

3. In its May 28, 2002 order, Paper No. 106, the Court directed that the submissions regarding sanctions be in letter format. They are filed with the court record at Papers No. 127.

order—with considerable regret—but without reservation:

(1) that Mr. Sweetland personally be sanctioned $8,649.25 pursuant to Rule 37(b);

(2) that Mr. Sweetland be referred to this Court's disciplinary committee to determine what, if any, action should be taken in connection with the self-acknowledged untruths he communicated to Defendants' counsel in a letter dated April 24, 2002, which proposed settlement terms;

(3) that the disciplinary committee further be asked to investigate certain representations made by Mr. Sweetland to this Court's clerk's office regarding the location of his principal place of practice in connection with his renewal application for membership in the bar of this Court;

(4) that any Court orders previously issued that treated as confidential Mr. Sweetland's statements, or those of others, made either parol or in writing, in connection with his representation of Plaintiffs in this case be lifted to the limited extent that any such statements relate to or are referred to in the rulings made herein; and

(5) that Evid. Rule 408 does not shelter Mr. Sweetland or any other counsel who would attempt to shield from the Court's scrutiny deliberately untruthful statements of material fact communicated to opposing counsel in settlement negotiations relating to litigation pending in this Court.

Because these rulings involve highly important matters that concern the proper behavior of counsel who are entrusted with protecting the public's interests in fairly resolving matters in the litigation process, the background leading to this dispute and the basis for the rulings must be discussed in detail below.

## BACKGROUND

The amended complaint asserts the claims of twenty-five plaintiffs, all represented by Mr. Sweetland, against Bank of America Corporation[4]; its related entity, Banc of America Auto Finance; and two unknown individuals, John Doe Number 1, alleged to be an unidentified employee of the Defendants, and John Doe Number 2, alleged to be an unidentified co-conspirator of John Doe Number 1 and who is not an employee of Defendants. Paper No. 21. The gravamen of the amended complaint is Plaintiffs' contentions that Defendants, through John Doe Number 1, improperly and without authorization, obtained consumer reports and/or investigative consumer reports regarding each Plaintiff and thereafter knowingly and willfully disseminated them to John Doe Number 2 and other unauthorized persons. Plaintiffs, who reside in twelve states and the District of Columbia, assert multiple causes of action against Defendants and the John Doe Defendants[5] and seek recovery of a total of $6,250,000.00 in compensatory damages, $62,500,000.00 in punitive damages, and costs and attorneys' fees. Paper No. 21.

---

**4.** These entities will be referred to collectively as "Defendants." The remaining defendants, John Doe Number 1 and John Doe Number 2, shall be referred to collectively as the "John Doe Defendants."

**5.** The ten counts include violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et*

*seq.;* the Maryland Consumer Credit Reporting Agencies Act, Md. Ann.Code, Com. II § 14–1201; civil conspiracy, negligent hiring and entrustment, and violation of 18 U.S.C. §§ 1030 *et seq.,* which involves fraud in connection with computers. Some of these counts were dismissed by Judge Garbis. Paper No. 29.

Defendants contend in numerous papers filed in this case and in Court hearings that an internal investigation failed to identify any employee responsible for the acts alleged to have been committed by John Doe Number 1 and, predictably and understandably, sought to discover the factual basis for Plaintiffs' numerous claims. This should have been an easy task, as such information clearly is discoverable under Rule 26(b)(1), but it was not.

Instead, at each turn, and in connection with each method of discovery employed, Defendants were unable to discover the factual bases of Plaintiffs' claims. What ultimately emerged from this time consuming, frustrating, and expensive process was that none of the Plaintiffs had personal knowledge of the facts underlying their claims. In fact, Plaintiffs were wholly ignorant that their credit information allegedly had been disseminated improperly to third parties until they received a letter from Mr. Sweetland informing them that Defendants had obtained their credit information and requesting their consent to become plaintiffs in this lawsuit.

Mr. Sweetland, in an effort not to divulge his own factual knowledge about Plaintiffs' claims, asserted the attorney client privilege and work product doctrine in responses to interrogatories and directed his clients not to answer questions concerning any factual information told to them by him. This tactic was rejected by the Court. Paper No. 58. Mr. Sweetland still refused, however, to provide this essential discovery, despite a succession of Court orders directing that he do so.[6] *See* Papers Nos. 50, 58, 70, 106 and transcript of April 22, 2002, hearing, attached to this memorandum and order as Exhibit 1. This, in turn, led the Court reluctantly to order at an April 22, 2002, hearing that Mr. Sweetland personally be required to answer interrogatories regarding the factual bases of Plaintiffs' claims. Unfortunately, from the Court's perspective, Mr. Sweetland still did not answer completely and non-evasively the interrogatories that were ordered, as is required by Rule 37(a)(3). Paper No. 106. I therefore ordered, on May 20, 2002, that Mr. Sweetland be deposed and informed counsel that I would preside over the deposition to insure com-

---

**6.** Despite Mr. Sweetland's continued objections that the factual information underlying Plaintiffs' claims was immunized from disclosure by the work product doctrine, which is incorporated in Rule 26(b)(3), the Court ruled at the April 22, 2002, hearing that the Defendants had made a sufficient showing of need and inability to obtain the equivalent information from other, non-privileged sources, and ordered that Sweetland be required to answer a limited number of interrogatories to provide fact work product but not opinion work product. This opinion, rendered from the bench, is attached as Exhibit 1 hereto.

Clearly, there is ample authority for a court to order that a lawyer representing a party in a lawsuit be subject to appropriate discovery—including, as occurred here, having his deposition taken. *See, e.g., Savoy v. Richard A. Carrier Trucking, Inc.,* 178 F.R.D. 346 (D.Mass.1998); *Harding v. Dana Transport, Inc.* 914 F.Supp. 1084 (D.N.J.1996); *Cascone*

*v. Niles Home for Children,* 897 F.Supp. 1263 (D.Mo.1995); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 164 F.R.D. 245 (D.Kan. 1995); *Doubleday v. Ruh,* 149 F.R.D. 601, 613 (E.D.Cal.1993); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.,* 125 F.R.D. 578, 593 (N.D.N.Y.1989); *In Re Arthur Treacher's Franchisee Litig.,* 92 F.R.D. 429, 437 (D.Pa.1981); *see also* 8A Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, *Federal Practice & Procedure* § 2102 (1994 & Supp.2002). Yet, because courts should be reluctant except in extraordinary circumstances to order such discovery, and in deference to the difficult position that its order placed Mr. Sweetland, the Court ordered that he first answer a limited number of interrogatories, but provided that if he did not answer completely and non-evasively, as required by Rule 37(a)(3), his deposition would be required.

pliance with the Court's order. *Id.* This deposition took place on June 11, 2002.

During the deposition Defendants finally discovered that Mr. Sweetland first learned of the alleged improper conduct of Defendants during August 2000 from a former client, who "said that there was some large scale operation operating out of Bank of America selling credit reports to private investigators and anybody else who was interested." June 11, 2002, deposition of Rodney R. Sweetland, III at 14 ("Sweetland Deposition"). This client also told Mr. Sweetland that an employee of the Defendants was selling credit information to a third party and gave him the names of individuals whose credit reports had been obtained. *Id.* at 17–21. Mr. Sweetland's client, however, refused to disclose the names of the person(s) from whom he learned this information because he "didn't want to get them involved." *Id.* at 18. Mr. Sweetland, in turn, wrote to the individuals identified by his client as having their credit information obtained by John Doe Number 1, and twenty-five of them agreed to join in the pending lawsuit. *Id.* at 40, Exh. 4.

During his deposition, Mr. Sweetland also was questioned about a letter that he wrote to Defendants' counsel, dated April 24, 2002, in which he offered settlement terms to Defendants. *Id.* at 71–75. In brief, Mr. Sweetland's letter proposed that, in return for a payment of $75,000.00 per plaintiff, or a total of $1,875,000.00, he would provide Bank of America "with the name and other identifying information concerning an individual who may best be described as John Doe # 3, the kingpin of the network which obtained credit reports from" Defendants. *Id.*, Exh. 7. He continued, however, that he did not then know John Doe Number 3's identity and that he purposely would not discover this information so that he could not be compelled by

court order to disclose it. *Id.* Specifically, he said:

> Please be advised that I do not at present know the identity of this individual. I have made confidential arrangements, however, to have that information provided to me once any possibility of my own deposition (or answering interrogatories) has passed. The source of the information will, not, for obvious, [reasons] provide me with any such information while I am subject to a court order. . . .

*Id.* Mr. Sweetland concluded relevantly: "I do not know how your clients wish to proceed against the people who penetrated their security, my understanding is that it will be relatively easy to unravel the situation once I provide you with John Doe # 3's identity." *Id.* Mr. Sweetland's statement that he could provide John Doe Number 3's identity, however, admittedly was untrue.

During his deposition, the following exchange took place between Mr. Sweetland and Defendants' counsel about Mr. Sweetland's statements in the letter.

Q. Mr. Sweetland, let me show you what's been marked as Deposition Exhibit Number 7. . . . My interest in that letter, though, is paragraph 1 where you make reference to John Doe Number 3.

A. Yes.

Q. Who is John Doe Number 3?

A. That would just be a [way of identification] I would use for the person that I believe to be the person outside of Bank of America that was getting these credit reports.

Q. Well in the lawsuit you have a John Doe 1, right?

A. That's right.

Q. And you have a John Doe Number 2, correct?

A. That's correct.

Q. And John Doe Number 2 you've alleged to be the person outside of the bank who received these credit reports or purchased or bought these credit reports, correct?

A. That's right.

Q. So why are we calling the John Doe in your April 24th 2002 letter that's marked as Exhibit Number [7] John Doe Number 3?

A. Well, my belief is, based upon my conversations with [my former client], that there's somebody else involved.

Q. And when did you have those conversations with [your former client]?

A. This would have been later in the case, probably p[a]st the initiation of discovery.

Q. Give me a month time frame.

A. If discovery began in December of 2001, this would have had to have been sometime in the first quarter of this year.

Q. So sometime in January through March of 2002?

A. That's correct.

Q. You had a conversation with [your former client]?

A. Well, one or more.

Q. One or more. And that is when John Doe Number 3 came up?

A. Well, again John Doe Number 3 is my term, not [my former client's]. That's somebody who just intellectually is categorizing people. It seemed to me to be convenient, if I've named John Doe Number 1 as the person inside the company, John Doe Number 2 as the person outside the company to whom these are given, I believe that there is a third individual that has some oversight or overarching role in this.

Q. Well, specifically you described him in your letter as the kingpin of the network which obtained credit reports from Banc, with a C, of America Auto right?

A. That's right.

Q. And this information is from [your former client]?

A. That's correct.

Q. What is the name of John Doe Number 3?

A. I do not know.

Q. And did you ask [your former client] for the name?

A. Yes, I did.

Q. And?

A. He did not give it to me.

Q. Why not?

A. I don't believe he wanted to.

Q. Well, in your letter, in the second paragraph, you indicate, please be advised that I do not at present know the identity of this individual. I have made confidential arrangements, however, to have that information provided to me once any possibility of my own deposition or answers to interrogatories has passed. What confidential arrangements are you talking about?

A. There were none. That was language put in there for the purposes of settlement bluster.

Q. So this is a lie?

A. That is correct. It is not true.

Q. So you never made any arrangements to find out the identity of John Doe Number 3?

A. No. I was attempting to find out the identity of John Doe Number 3, but while we were in settlement discussions, I wanted to make the representation, for the purposes of maximizing my clients' settlement position, that I could obtain an individual to provide to your in-house counsel.

Q. And can you?

A. No.

Q. So at the time you made this statement, you were lying?

A. That's correct.

Q. Why are you unable to obtain the name of this person?

A. Because [my former client] won't give it to me.

Q. And why will he not give it to you?

A. I don't know. You'd have to ask him.

Q. Did you ask him why he wouldn't give it to you?

A. I did. And he said, you don't want to know.

Q. And what did you say then?

A. Well, at some point I stopped asking. But I mean I certainly pressed him on it.

Sweetland Deposition at 71–76 (emphasis added).

After the deposition concluded, Defendants wrote to this Court, sent a copy of the transcript of Mr. Sweetland's deposition, and argued, *inter alia,* that Mr. Sweetland's self-acknowledged lie was evidence of his bad faith, warranting imposition of monetary sanctions against him for his failure to answer completely and nonevasively the interrogatories ordered by the Court. In response, Mr. Sweetland argued that Defendants could not rely on the mandatory sanctions of Rule 37(d), but, instead, any award of sanctions would fall within the discretionary sanctions of Rule 37(b). He further asserted that "[a] confidential settlement letter to defendants is not a proper substantive or procedural basis for any action by this Court" because the letter stated it was sent " 'under aegis of Fed.R.Evid. 408 and without prejudice or effect for any other purpose.' "

For reasons that will be explained below, I agree with Mr. Sweetland that his statements in the settlement letter sent to Defendants may not be considered by me in connection with the pending motion, as they have an insufficient causal nexus with the events that resulted in this Court ordering the interrogatories to, and deposition of, Mr. Sweetland. I do find, howev-er, that sanctions are appropriate against him under Rule 37(b)(3) for failing to identify the source of the factual basis of Plaintiffs' claims and that this refusal caused Defendants to incur substantial costs and attorneys' fees, the reasonable portion of which should be awarded against Mr. Sweetland personally.

Moreover, I conclude that Mr. Sweetland woefully is misinformed about the scope of Evid. Rule 408 and the limited extent to which it is intended to shield from use statements offered in an effort to compromise disputed claims. Further, the statements made in the April 24, 2002, settlement letter and Mr. Sweetland's ready acknowledgment of their falsity during his deposition require me to refer this matter to this Court's disciplinary committee. In addition, from my review of the correspondence and pleadings authored by Mr. Sweetland in this case, it also is necessary to refer to the disciplinary committee the question of whether Mr. Sweetland answered with the required candor an inquiry by this Court's clerk's office regarding the location of his principal place of practice, which is relevant to whether he met the requirements of Local Rule 701.1 for admission to the bar of this Court.

## DISCUSSION

### A. The Imposition of Sanctions

Defendants seek an award of attorneys' fees because of costs and fees needlessly incurred in attempting to discover the factual basis of Plaintiffs' claims against them. They argue that Mr. Sweetland's admitted mendacity in the settlement letter he wrote is one factor to be considered by the Court in assessing whether to impose sanctions against Mr. Sweetland under Rule 37.

There are three primary ways that parties seek to recover attorneys' fees against

an opposing party or counsel for abuse of the litigation process. The first way is Rule 11, which is not applicable in this case because it expressly does not apply to discovery disputes. Rule 11(d). The second way is the Court's inherent authority to prevent litigation abuse, which was discussed at considerable length by the United States Supreme Court in *Chambers v. NASCO*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The third way is the rules of procedure relating to discovery, notably Rule 37, or a federal statute, such as 28 U.S.C. § 1927.[7]

As discussed below, neither the court's inherent authority to impose sanctions nor Rule 37 is an appropriate tool in this case for addressing Mr. Sweetland's deceitful statements made in the settlement letter to the Defendants. As will be seen, however, this does not mean that the Court is without means to address Mr. Sweetland's mendacity. Moreover, it is entirely appropriate for this Court to impose sanctions, pursuant to Rule 37(b), concerning the myriad discovery abuses perpetrated by Mr. Sweetland, which were wholly independent of his conduct concerning the settlement letter.

■ In *Chambers, supra,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27, the Supreme Court ruled that there are three circumstances where a federal court may exercise its inherent authority to assess attorneys' fees: (a) under the "common fund" doctrine where courts historically have equity power to award such fees to a party whose litigation efforts benefit others directly; (b) as a sanction for willful disobedience of a court order; and (c) when a party or an attorney has acted in bad faith vexatiously, wantonly, or for an

oppressive reason. *Id.* at 45–46, 111 S.Ct. 2123. The court made clear that the "American Rule," which restricts when attorneys' fees may be awarded to a litigant, limits the use of a court's inherent authority to impose sanctions to circumstances involving either bad faith conduct or willful disobedience of court orders. *Id.* at 47, 49, 111 S.Ct. 2123. The Court additionally noted that there are mechanisms, other than inherent authority, that may allow an award of attorneys' fees as a sanction, such as the rules of civil procedure or 28 U.S.C. § 1927, without requiring a finding of bad faith, and that a court may sanction using its inherent authority concurrently with rules of procedure or the federal statute. *Id.* at 49–50, 111 S.Ct. 2123. The Court cautioned, however, that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44, 111 S.Ct. 2123.

In *U.S. v. Shaffer Equipment Company,* 11 F.3d 450 (4th Cir.1993), the Fourth Circuit also has addressed when a district court may use its inherent authority to sanction an attorney in connection with deceitful conduct during the litigation process. Judge Niemeyer's comments in that case about an attorney's duty of candor during the litigation process are particularly instructive to this case. He said, relevantly:

> Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argu-

---

7. 28 U.S.C. § 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unrea-

sonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

ment to reasoned conclusions—all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent.

While no one would want to disagree with these generalities about the obvious, it is important to reaffirm, on a general basis, the principle that lawyers, who serve as officers of the court, have the first line task of assuring the integrity of the process. Each lawyer undoubtedly has an important duty of confidentiality to his client and must surely advocate his client's position vigorously, but only if it is truth which the client seeks to advance. The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up what is necessary for justice in the end.

*Id.* at 457–458.

The court added that while Rules 3.3 and 3.4 of the Rules of Professional Conduct impose a duty of candor to the court and opposing counsel throughout the litigation process,[8] "neither these rules nor the entire Code of Professional Responsibility displaces the broader general duty of candor and good faith required to protect the integrity of the entire judicial process." *Id.* at 458. The court concluded that "[t]he

general duty of candor and truth thus takes its shape from the larger objective of preserving the integrity of the judicial system." *Id.*

As it presently is conducted, the judicial resolution of civil disputes certainly must include settlement negotiations involving pending litigation, as they are an integral part of this process. Far greater numbers of civil cases are brought each year than ever can be resolved through trial or motions practice, and the vast majority of such cases filed are disposed of through settlement. As the filing of civil cases outpaced the ability of courts to try them, alternative dispute resolution ("ADR") procedures almost universally have been adopted to provide either formal or informal procedures to settle cases. Indeed, in the federal system, ADR "[occurs] in all three types of courts—district, bankruptcy, and appellate—and [reflects] both a general societal trend toward greater use of ADR and a specific statutory authorization to use ADR." *Guide to Judicial Management of Cases in ADR* at 1 (Federal Judicial Center 2001). In fact, in 1998 Congress mandated that each district court adopt ADR procedures[9] and, in this Court, so much value is placed in the efficacy of ADR to resolve cases promptly and inexpensively that the process is handled by judicial officers—the magistrate judges. Local Rule 607.

It does not require a rule of professional responsibility for a lawyer to know that, during the process of settlement negotiations, he or she may not lie to opposing

---

8. As will be discussed in more detail below, Rule 4.1 of the Rules of Professional Conduct requires truthfulness in statements to others and prohibits a lawyer from making false statements of material fact to a third person. Rule 4.1 has been described as imposing on an attorney the same duty of candor outside the courtroom that governs statements made to the court itself. *See* ABA/BNA Lawyers Manual of Professional Conduct § 71:203 (1997). The phrase "third persons" includes other lawyers and applies to statements made during the negotiation process. *Id.* at § 71:209–210. *See also* 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 37.3 (3d ed.2000).

9. 28 U.S.C. § 651 *et. seq.*

counsel about a fact that is material to the resolution of the case. It is just as damaging to the integrity of our adversary system for an attorney knowingly to make a false statement of material fact to an opposing counsel during settlement negotiations, as it is to lie to a lawyer or the judge in court. It is one thing, however, to acknowledge the obvious importance of candor during the settlement process and quite another thing to invoke the court's inherent authority to sanction an attorney for intentionally deceitful conduct during settlement negotiations if that conduct is not sufficiently connected to a specific issue that must be ruled upon by the judge.

Like the Supreme Court, the Fourth Circuit has warned against the incautious use of a court's inherent authority, by stating in *Shaffer Equipment, supra,* that "[b]ecause the inherent power is not regulated by Congress or the people and is particularly subject to abuse, it must be exercised with the greatest restraint and caution, and then only to the extent necessary...." 11 F.3d at 461–462 (citations omitted). Accordingly, a trial judge should restrain an understandable impulse immediately to address deceitful conduct by an attorney in connection with settlement negotiations and take a moment to reflect whether he or she should use the court's inherent authority to address it or refer it to a bar disciplinary committee.[10]

■ Simply put, the question is whether a trial court, faced with credible allegations of serious ethical misconduct by an attorney in connection with a pending case, ought to undertake for itself the process of making factual determinations necessary fairly to resolve the issue, or instead refer the matter to an appropriate bar disciplinary committee. While each judge must make this call for himself or herself, the Court believes that, in this case, it is fairer to the parties, the attorneys, and the preservation of the integrity of our adversary system of dispute resolution to decline to exercise the inherent authority of the court and instead refer this matter to the Court's disciplinary committee pursuant to Local Rule 705.

Because this local rule creates detailed procedures to facilitate the fair resolution of allegations of ethical misconduct, and for the reasons that I will explain below, I specifically will refer to the disciplinary committee Mr. Sweetland's conduct during his settlement negotiations with Defendants' counsel. These negotiations insufficiently were connected with the narrow issue of discovery abuse that presently is pending to justify addressing them myself under the inherent authority of the Court.

■ Having decided to make a referral to the disciplinary committee, however, does not mean that Mr. Sweetland should not be required to pay to Defendants the costs and reasonable attorneys' fees relating to their effort to learn the factual basis for Plaintiffs' causes of action. Mr. Sweetland himself acknowledges that it is within

---

**10.** *Crowe v. Smith,* 261 F.3d 558 (5th Cir. 2001), demonstrates all too well the need to move prudently in determining a course of action in addressing an attorney's misconduct. In *Crowe,* the trial court did invoke its inherent authority to sanction several attorneys for dishonest conduct during settlement negotiations relating to a case pending before it. The sanctions imposed included disbarment. On appeal, the Fifth Circuit noted the enhanced burden of proof required to sanction based on a finding of bad faith, which is necessary to support the use of inherent authority to sanction. *Id.* at 563 ("To support a finding of bad faith, the evidence must be so direct and weighty as to leave the fact finder with a firm belief in the truth of the facts of the case."). The Fifth Circuit reversed the district court's findings that the attorneys had acted unethically because its *de novo* review of the record convinced it that the evidence of the attorneys' deceitfulness did not amount to bad faith under the enhanced standard of proof.

the Court's discretion under Rule 37(b) to award such a sanction. And, based on a review of all the facts of record, I conclude that, in light of the unambiguous order of April 22, 2002, and Mr. Sweetland's subsequent refusal to answer completely and non-evasively the interrogatories that I ordered him to answer, Defendants were required to incur costs and attorneys' fees to compel and take his deposition.

Only after being deposed did Mr. Sweetland finally provide the information that he readily had available since at least as early as August 2000. Sweetland Deposition at 14. Given the succession of court orders requiring the disclosure of the facts underlying Plaintiffs' claims, the manifest importance of Defendants' need to know this information to conduct a defense, and the clarity of the Court's directive that it must be provided, I find that Mr. Sweetland's refusal to obey the April 22, 2002, order was not substantially justified and a sanction of costs and reasonable attorneys' fees against him personally, but not his clients, would not be unjust.[11]

In this regard, I emphasize that, while the refusal to comply with the Court's April 22, 2002, order took the form of Mr. Sweetland's failure to provide complete and non-evasive interrogatory responses, he is sanctioned not in the capacity of a "witness," but in his capacity as Plaintiffs' counsel, which he has held since the inception of this lawsuit. The circumstances under which he found himself having to testify entirely were of his own making, as was explained during the April 22, 2002 hearing.

## B. The Referral to the Disciplinary Committee

### 1. The April 24, 2002, Settlement Letter

Local Rule 704 adopts the Rules of Professional Conduct "as they have been adopted by the Maryland Court of Appeals" to lawyers practicing before this Court. The Maryland Court of Appeals has adopted essentially verbatim the model rules prepared by the American Bar Association. *Brown & Sturm v. Frederick Road*, 137 Md.App. 150, 768 A.2d 62, 78 (2001). Rule 4.1 pertains to "truthfulness in statements to others" and requires, relevantly that "[i]n the course of representing a client a lawyer shall not knowingly (1) make a false statement of material fact or law to a third person." Rule 4.1(a). It is identical to the ABA Model Rule of the same number. Although there are few reported decisions in Maryland dealing with this Rule, it has been discussed extensively in the commentary to the ABA Model Rules, by legal treatises, and legal publications. An overview of these materials amply demonstrates why Mr. Sweetland's actions concerning the April 24, 2002, settlement letter must be referred to this Court's disciplinary committee.

The commentary to ABA Model Rule 4.1 makes the following points regarding its scope: (a) the rule addresses only false statements knowingly made, or information withheld when it should have been disclosed. The required state of mind, however, may be inferred from the surrounding circumstances and encompasses careless and recklessly negligent conduct; (b) an opposing counsel is a "third person" within the meaning of the rule, meaning

11. From the deposition transcripts of Plaintiffs that have been filed with the court in connection with the extensive discovery motions practice in this case, it is apparent that none of the twenty-five plaintiffs have personal knowledge of the underlying facts, as also was confirmed by Mr. Sweetland's deposition testimony. To sanction them, therefore, would be unjust.

that the duty of candor extends to an attorney representing a party adverse to the lawyer whose conduct is in question; (c) Rule 4.1(a) specifically applies to the process of negotiation.[12]

Legal treatises on the subject of attorney ethics are in agreement with the commentary to the ABA Model Rules [13] and further amplify the scope of Rule 4.1. For example, the duty of candor required in Rule 4.1 "corresponds to the identically phrased duty [of candor] that a lawyer owes to the tribunal under Model Rule 3.3(a)(1)." ABA/BNA Lawyers' Manual on Professional Conduct § 71:201 (1997); *see also* 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 37.3 (3d ed.2000). ("Rule 4.1(a) applies to statements a lawyer makes to third persons out of court, statements to a court or other tribunal are governed by Rule 3.3(a)(1), which is otherwise identical.").

The treatises also make reference to an issue that extensively is discussed in legal publications: recognizing just where the line is to be drawn between ethical and unethical behavior during the negotiation process can be difficult to discern. Patently, certain aspects of the process unavoidably involve statements that are less than completely accurate, such as posturing or puffery, intentional vagueness regarding a negotiating party's "bottom line," esti-

mates of price or value, and the party's ultimate intentions regarding what an acceptable settlement would be—all of which are thought to encompass representations that are not "material." ABA/BNA Manual at § 71:211 (1997), 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 37.3. Nevertheless, the core requirement of Rule 4.1(a) is simple and clearly grasped:

"[i]n its simplest application, Rule 4.1(a) merely codifies a simple proposition: although lawyers are supposed to be zealous partisans of their clients, they must draw the line at lying. The law generally and all lawyer codes of conduct have always been clear that a lawyer may not make misrepresentations to a court, a client, or to a third person. Rule 4.1(a) recodifies the traditional rule that a lawyer's word is his bond".

2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 37.2. Further, while the legal journals have debated extensively the contours of what is acceptable under Rule 4.1, the federal and state courts that have focused on this issue have made it clear that lawyers face discipline and potential civil liability if they fail to comply with the rule.

In *Slotkin v. Citizens Casualty of New York*, 614 F.2d 301 (2d Cir.1979), an attorney, representing a defendant in a person-

---

**12.** In addition, a January 2002 ABA Litigation Section draft of "Ethical Guidelines for Settlement Negotiations," though not then submitted or approved by the ABA, proposed the following guideline:

> 4.1.1 False Statements of Material Fact-
> In the course of negotiating or concluding a settlement, a lawyer may not knowingly make a false statement of material fact (or law) to a third person.

The committee notes to the proposed guideline restate many of the same principles that are contained in the commentary to Model Rule 4.1 and offer further evidence of the near universal acceptance that lying about a

material fact in the course of settlement negotiations is unethical. *Id.* at 32.

**13.** For example, there is clear agreement that Rule 4.1(a)(1) applies to statements made to an opposing counsel. ABA/BNA Manual at § 71.209(1997); 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 37.3 ("Rule 4.1(a) first and most obviously forbids a lawyer from taking the initiative in lying to a third party such as an opposing counsel"). The Rule also applies to truthfulness in the negotiation process. ABA/BNA Manual at § 71:210, 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 37.3 & Illus. 37–1.

al injury case, stated during settlement negotiations that "to the best of his knowledge" there was only $200,000.00 in potential insurance coverage. Documents in his possession, however, reflected that he should have known of the existence of an additional $1 million excess policy. Based on the misrepresentation of coverage, the plaintiff settled the case and thereafter learned of the true facts. The plaintiff did not seek to set aside the settlement but instead brought a lawsuit in federal court alleging, among other claims, that the defense attorney was liable for fraud. The jury found for the plaintiff, but the trial judge granted the lawyer a judgment as a matter of law. The Second Circuit reversed, concluding that the scienter needed to establish fraud was satisfied by the lawyer's "reckless indifference to error" and rendered him liable in fraud to the plaintiff. *Id.* at 314.

In *Virzi v. Grand Trunk Warehouse and Cold Storage Co.,* 571 F.Supp. 507 (E.D.Mich.1983), an attorney for an injured person filed a diversity personal injury action in federal court. Pursuant to a court-ordered mediation, a settlement was reached. Before it was finalized, however, the plaintiff died of causes unrelated to the claim, yet his attorney failed to disclose this and allowed the settlement to go forward. The defendant learned of this development and filed a motion to set aside the settlement. The court analyzed the conduct of plaintiff's counsel under Rule 4.1 and concluded that the failure to disclose the plaintiff's death was a material misrepresentation by omission and amounted to a failure to adhere to the requirement of candor to others. The court stated, relevantly:

> The handling of a lawsuit and its progress is not a game. There is an absolute duty of candor and fairness on the part of counsel to both the Court and opposing counsel. At the same time, counsel has a duty to zealously represent his client's interests. That zealous representation of interest, however, does not justify a withholding of essential information, such as the death of the client, when the settlement of the case is based largely upon the defense attorney's assessment of the impact the plaintiff would make upon a jury, because of his appearance at depositions. Plaintiff's attorney clearly had a duty to disclose the death of his client both to the Court and to opposing counsel prior to negotiating the final agreement.

*Id.* at 512.

More recently, in *Pendleton v. Central New Mexico Correctional Facility,* 184 F.R.D. 637 (D.N.M.1999), the court resolved a Rule 11 motion filed against an attorney who represented a plaintiff in a job discrimination suit. The motion was based on the attorney failing to disclose during settlement negotiations his knowledge of a retaliation claim, arising out of the underlying employment claim that ultimately was settled. When the attorney filed a second suit based on the retaliation claim, the defendant argued that it had been duped into the first settlement. Although the court ruled, for procedural reasons, that the Rule 11 motion would not be granted, it was less than charitable in its comments regarding the conduct of plaintiff's counsel. The court stated:

> As we go through this life we learn, and sometimes the hard way, who we can trust to be candid and who we cannot. It is unfortunate that some attorneys apparently feel no obligation to their fellow attorneys, but then again, as the saying goes, "it's a short road that doesn't have a bend in it." The Rules of Professional Conduct and the case law suggest that, even in the context of finalizing a settlement agreement and release, a knowing failure to disclose a non-confidential, material and objective

fact upon inquiry by opposing counsel is improper.

*Id.* at 641 (internal citations deleted).

The state court decisions also have shown little appetite for attorney breaches of the duty of candor to others, predominantly in the form of decisions upholding the imposition of disciplinary sanctions. *See, e.g., The Florida Bar v. Cramer,* 678 So.2d 1278 (1996) (disbarring an attorney, who, among other things, misrepresented to leasing company the identity of who would be using leased office equipment); *In Re Carl C. Hendricks,* 319 S.C. 465, 462 S.E.2d 286 (1995) (disbarring attorney for multiple violations, including Rule 4.1, by misrepresenting facts to a title insurance company during negotiations to obtain a title policy). Similarly, in *Monroe v. The State Bar of California,* 55 Cal.2d 145, 10 Cal.Rptr. 257, 358 P.2d 529 (Ca.1961), the court found that the attorney had, among other charges, misrepresented to opposing counsel that certain funds would be deposited in escrow with his firm in connection with an agreement negotiated to stay the execution against the lawyer's clients. In fact, the deposit never was made. The court, ordering a thirty-day suspension of the attorney, stated that "[i]ntentionally deceiving opposing counsel is grounds for disciplinary action." *Id.* at 533.

In *Nebraska State Bar Assoc. v. Addison,* 226 Neb. 585, 412 N.W.2d 855 (1987), the plaintiff's attorney negotiated a reduction of the hospital's lien against proceeds of personal injury recovery by a plaintiff at a very favorable amount by failing to disclose the existence of a $1 million umbrella policy potentially affording an additional source of recovery. The court affirmed a finding that the attorney had violated DR 7–102(A)(5), the predecessor to Rule 4.1, and imposed a six-month suspension. Just recently, in *In re Disciplinary Proceeding against Stephen T. Carmick,* 48 P.3d 311 (Wash.2002), the court upheld a sixty-day

suspension of an attorney for several infractions, including misrepresentations made to a third person during settlement negotiations, in violation of Rule 4.1.

Finally, although not a disciplinary action, in *Kingsdorf v. Kingsdorf,* 351 N.J.Super. 144, 797 A.2d 206 (2002), the court refused to enforce a settlement agreement negotiated in a divorce case where the wife agreed to give up her claims to a valuable piece of jointly owned property in favor of receiving a lesser valued, encumbered property as an exchange from her husband. Counsel for the husband failed to disclose that her client died before the divorce decree was finalized, meaning the property in question should have become the wife's upon the husband's death as a joint owner. The Court stated:

> The failure to disclose a material fact to a tribunal is an ethical violation.... A lawyer's responsibility to act with candor and honesty necessarily requires disclosure of significant facts, even though the disclosure might not be in the interest of the client.... An attorney is not merely a hired gun, but, rather, a professional required to act with candor and honesty ... Lawyers have an obligation of candor to each other and to the judicial system, which includes a duty of disclosure to the court and opposing counsel.

*Id.* at 154, 797 A.2d 206.

■ Viewed collectively, these cases demonstrate that both the federal and state courts have been ready to discipline or hold liable attorneys who make knowing, material misrepresentations to third persons during settlement negotiations. While there still may be legitimate debate regarding which aspects of the negotiation process demand strict adherence to the requirements of candor, as the legal journals demonstrate, this much at least is not subject to principled argument: Rule 4.1(a)(1) prohibits an attorney from know-

ingly deceiving a third person, including an opposing counsel, during negotiations. The misrepresentation may be either express or by a failure to disclose. It also must involve a fact or the law that is material to the negotiation, which necessarily must be evaluated on a case-by-case basis.

While the term "material" is not defined in Rule 4.1 or its commentary, it is not a difficult concept to comprehend. A fact is material to a negotiation if it reasonably may be viewed as important to a fair understanding of what is being given up and, in return, gained by the settlement. While the legal journals engage in some hand-wringing about the vagueness of this aspect of Rule 4.1, in reality, it seldom is a difficult task to determine whether a fact is material to a particular negotiation. In cases of real doubt, disciplinary committees and ultimately the courts will decide.

Because of its critical relation to the litigation process itself, there can be no real doubt that, to borrow the words of the Fourth Circuit in *Shaffer Equipment, supra*, during the settlement phases of a case, like the litigation phase, "[t]he system can provide no harbor for clever devices to divert the search, mislead opposing counsel, or cover up what is necessary for justice in the end." 11 F.3d at 457–58. In the context of a settlement, "justice" means a fairly negotiated resolution, based on candor and integrity with respect to all material representations.

As noted, the law journals reflect an extensive debate regarding the ethics of misrepresentation during the negotiation process. One usefully summarized the various schools of thought on this issue as follows:

In relation to lawyers representing clients in negotiations, there is a wide chasm dividing expert opinion on the applicable standard of truthfulness. At one extreme on the 'truthfulness spectrum' is Judge Alvin B. Rubin of the United States Circuit Court of Appeals for the Fifth Circuit. Writing in the mid–1970s, Judge Rubin proposed two 'precepts' to guide a lawyer's conduct in negotiations: (1) 'The lawyer must act honestly and in good faith', and (2) 'The lawyer may not accept a result that is unconscionably unfair to the other party.' In 1980, Professor James J. White published an article in which he asserted his belief that misleading the other side is the very 'essence of negotiations' and is all part of the game. White observed that truth is a relative concept that depends on the definition one chooses and the circumstances of the negotiator. He further noted that lawyers hunt 'for the rules of the game as the game is played in the particular circumstance.' He identified the paradox of lawyers' goals in negotiation—how to 'be fair but also mislead.' In 1981 Yale law Professor Geoffrey C. Hazard, Jr., principal draftsman of the Model Rules of Professional Conduct, after reviewing Judge Rubin's and Professor White's articles and other pertinent literature of the day concluded that 'legal regulation of trustworthiness [could not] go much farther than to proscribe fraud.' In 1982, Professor Thomas F. Guernsey sought a middle-ground solution. He suggested that conventions regarding truthfulness dilemmas can be formulated to guide those lawyers aspiring to be ethical, but that the default standard in all negotiations should be 'caveat lawyer.' More recently, other commentators have advocated various truthfulness standards for lawyers in negotiating in terms of maintaining 'total candor,' minimizing 'an unreasonable risk of harm,' forbidding all deception, permitting 'conventions of untruthfulness' seeking 'advantageous results ... consistent with honest dealings with others, practicing the 'golden rule'-reciprocal candor, and scrutinizing 'what

is not lie and what lies are ethically permissible.'

John W. Cooley, *Mediation Magic: Its Use and Abuse,* 29 Loyola U. Chi. L.J. 1, 42 (1997). Other journals have identified the difficulty inherent in trying to impose proper norms in an area of activity that typically takes place "behind closed doors,"

but all recognize, as they must, that however difficult this task may be, and however desirable it is to develop a set of norms that are easily understood and applied, Rule 4.1 creates a floor below which lawyer-negotiators may not go.[14]

The above discussed cases and journal articles help to define the problem associ-

**14.** *See, e.g.,* Robert Fitzpatrick, *Attorneys' Ethical Responsibilities During Settlement Negotiations,* SG047 A.L.I.-A.B.A. 1153, 1157 (1999) ("When material facts or law are involved, Rule 4.1 applies and attorneys may not lie or deliberately misrepresent the circumstances... A lawyer may refuse to answer a question or employ evasive tactics, but deliberate misrepresentations will violate Rule 4.1."); Nathan M. Crystal, *The Lawyer's Duty to Disclose Material Facts in Contract or Settlement Negotiations,* 87 Ky. L.J. 1055, 1083 (1999) ("On its face [Rule 4.1] appears to impose two obligations on lawyers: a broad, unqualified duty not to knowingly make false statements of material fact or law and a narrow duty to disclose material facts."); Paul Rosenberger, *Laissez–Faire: An Argument for the Status Quo Ethical Constraints on Lawyers as Negotiators,* 13 Ohio St. J. on Disp. Resol. 611, 614–615 (1998) ("Despite the prevalence of negotiation in the practice of an attorney, comparatively few ethical rules have been created to directly address the role of an attorney in the process of negotiation....From the general duty of zealous representation comes one of the most important areas of negotiation ethics: misrepresentation. Generally, an attorney may not misrepresent any material fact....Thus, by custom, attorneys are permitted (and even expected) to misrepresent to some extent not only what their clients would find acceptable, but also the extent of their own authority to settle. This issue lies at the heart of the dichotomy facing attorneys when entering negotiations with the highest 'utopian' views of their ethical duties—that '[t]o mislead an opponent about one's true settling point, is the essence of negotiation.' Thus interpreting the rule, one may say that his client will not accept or authorize less than a certain figure while knowing the statement is not true. But one may not say falsely that the loss to his client exceeds a certain figure. A leading text on negotiations gives these simple words of advice: 'When in doubt...either tell the truth,

decline to give a value, or generalize. But do not lie.' ") (citations omitted); Charles B. Craver, *Negotiation Ethics: How to be Deceptive Without Being Dishonest/How to be Assertive Without Being Offensive,* 38 S. Texas L.Rev. 713, 716, 719 (1997) ("Despite the nobility of such pronouncements, others maintain that '[p]ious and generalized assertions' that the negotiator must be 'honest' or that the lawyer must use 'candor' are not helpful. They recognize that negotiation interactions involve a deceptive process in which a certain amount of 'puffing' and 'embellishment' is expected, as the participants attempt to convince their opponents that they must obtain better terms than they must actually receive .... Although the ABA Model Rules unambiguously proscribe all lawyer prevarication, they reasonably, but confusingly, exclude mere 'puffing' and dissembling regarding one's true minimum objectives. These important exceptions appropriately recognize that disingenuous behavior is indigenous to most legal negotiations and could not realistically be prevented due to the nonpublic nature of bargaining interactions.") (citations omitted); Robert L. Condlin, *Bargaining in the Dark: The Normative Incoherence of Layer Dispute Bargaining Role,* 51 Md. L.Rev. 1, 77 (1992) ("Lawyers may not lie for clients... either to adversaries or courts, or mislead opponents, either by act or omission, when to do so would be civilly actionable.") (citations omitted); Scott Dahl, *Ethics on the Table: Stretching the Truth in Negotiations,* 8 Rev. Litig. 173, 180 (1989) ("Model Rule 4.1 is the counterpart to DR 7–102. Rule 4.1(a) prohibits an attorney from making false statements of material fact or law to a third person. 'Material fact' is not specifically defined in the rules, but the comment to Model Rule 4.1 explains that materiality depends on the circumstances. The comment includes two examples of nonmaterial statements: (1) 'estimates of price or value placed on the subject of a transaction' and (2) 'a party's intentions as to an acceptable settlement of a claim' ").

ated with fashioning a workable rule governing attorney conduct during settlement negotiations, as well as to suggest its solution. In the end, Professor Hazzard well may have stated it correctly. While the duty imposed by Rule 4.1(a)(1) may be a narrow one—not to misrepresent knowingly facts or law material to the negotiation—it is also an absolute one.

In each instance the questions for the negotiating attorney, as well as a reviewing disciplinary committee or court if called upon to do so, is to determine: (1) what is the statement or omission in dispute? (2) is it untrue or deceptively incomplete in any significant respect? (3) reasonably viewed, is it important to the subject that is being negotiated? and (4) at the time it was made, did the attorney know or should have known under the circumstances that the statement was untrue? In the pending case, answering these questions easily shows why there is abundant evidence requiring the referral of Mr. Sweetland's statements in his settlement letter to the Defendants' attorney to the Court's disciplinary committee.

In the April 24, 2002, settlement letter, Mr. Sweetland made the following statements that are relevant to the issue in dispute, which may be paraphrased as follows: (a) that if Defendants paid the demanded sum, or any agreed upon reduction thereof, Mr. Sweetland would provide to them the name and other identifying information regarding John Doe Number 3, described as the "kingpin of the network which obtained credit reports" from Defendants; (b) that Mr. Sweetland did not then know the identity of John Doe Number 3 because he had taken steps not to learn this until his deposition had passed but had made confidential arrangements to

have that information provided to him once there was no longer any threat of his deposition; and (3) it was Mr. Sweetland's understanding that "it will be relatively easy to unravel the situation [regarding who 'penetrated' the security of Defendants] once I provide you with John Doe # 3's identity." In return for Mr. Sweetland's disclosures, Mr. Sweetland would recommend that each Plaintiff settle for $75,000.[15]

During his deposition, Mr. Sweetland was asked what the confidential arrangements were that he had made to learn John Doe Number 3's identity, to which he answered, "There were none. That was language put there for the purposes of settlement bluster." Defendant's counsel pointedly asked, "So this is a lie?" Mr. Sweetland's succinctly stated "That is correct. It is not true." Next, he was asked, "So you never made any arrangements to find out the identity of John Doe Number 3?" Mr. Sweetland answered, "No. I was attempting to find out the identity of John Doe Number 3, but while we were in settlement discussions, I wanted to make the representation, for the purposes of maximizing my clients' settlement position, that I could obtain an individual to provide to your in-house counsel." Defendants' counsel persisted, "So at the time you made this statement, you were lying?" Mr. Sweetland answered, "That's correct."

It is clear, therefore, from Mr. Sweetland's own admission under oath that, at the time he wrote the letter, he knew he was not being truthful. With respect to whether his untruthful statements were material, there is little doubt that, from Defendants' perspective, they were. This entire lawsuit involves asserted liability against the Defendants because, allegedly,

---

**15.** The letter does suggest that, if settlement discussions continue, Mr. Sweetland would forego statements to the press or any activity with Congressional staffers working on privacy matters, but these statements were not characterized as consideration for the settlement but as concessions that would be made during the settlement negotiation process.

an employee, John Doe Number 1, sold information to a non-employee co-conspirator, John Doe Number 2, all, according to the settlement letter, at the instance of the "kingpin," John Doe Number 3. Throughout the case, Defendants have protested that they were not able to locate any employee that may have disclosed Plaintiffs' credit information. In response, Plaintiffs essentially have contended that the identities of the John Doe Defendants are irrelevant in determining whether Defendants are liable. Even assuming arguendo that Plaintiffs are correct, it still would be of paramount importance to the Defendants to learn the identity of John Doe Number 3 so they could take action to end his/her activities and cut off any potential future liability. Given that the only real term suggested by Mr. Sweetland for the more than $1.8 million that Defendants were being asked to pay was the identification of John Doe Number 3, it certainly is not unreasonable to conclude that the misrepresentation concerned facts material to the negotiations.

■ Mr. Sweetland views his comments as "settlement bluster," and may therefore believe that they did not address material statements of fact. However skeptically the Court might regard any such position, it is not my call to make. But what is clear is that there is more than a sufficient factual basis to compel the referral of this matter to the disciplinary committee of this Court. While the principal ethical rule discussed in this order was Rule 4.1, the cases and commentary make clear that other rules might potentially overlap with that rule when evaluating the conduct involved here. One such rule is 8.4(c) that states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation. Therefore, when the Disciplinary Committee takes up this matter, they will be free to explore whether violations of any rules they deem applicable occurred.

### 2. Location of Mr. Sweetland's Principal Law Office

■ Local Rule 701 sets out the requirements for admission to the bar of this Court. As relevant to this case, the Rule states that "an attorney is qualified for admission to the bar of this District if the attorney is a member in good standing of the highest court of any State (or the District of Columbia) in which the attorney maintains his or her principal law office."

Mr. Sweetland's original and renewal applications for membership to the bar of this Court confirms that the only "state" in which Mr. Sweetland is admitted to practice is the District of Columbia.[16] A search of the membership database of the District Columbia bar web site does confirm that Mr. Sweetland is a member of that bar.[17] Accordingly, for Mr. Sweetland to qualify for admission to the bar of this Court, his principal law office must be in the District of Columbia. A cursory inquiry, however, reveals that Mr. Sweetland's principal law office, in fact, may be in Virginia.

For example, the District of Columbia Bar Association's web site lists Mr. Sweetland's address as 1655 North Fort Myer Drive, Suite 700, Arlington, Virginia 22209, and this Virginia address has been used by him on every pleading and piece of correspondence that he has sent to this Court in connection with this case. But in Mr. Sweetland's April 21, 2002, renewal application for membership to this bar, he states that the only state bar in which he

---

**16.** A check of the Client Security Trust Fund list of Maryland attorneys confirms that Mr. Sweetland is not a member of the State Bar of Maryland. He also is not a member of the Virginia bar, as confirmed by a telephone call to the Virginia State Bar, 1–804–775–0530.

**17.** www.dcbar.org.

holds membership is the District of Columbia, and he answered in section C.4: "My principal law office is located in Washington, D.C." This application was signed by Mr. Sweetland under penalty of perjury.

When Mr. Sweetland's renewal application was processed in the clerk's office, Ms. Cathy Scaffidi, the attorney admission program' specialist, alertly noticed that the address in the court's records for Mr. Sweetland was the Arlington, Virginia address noted above. She contacted Mr. Sweetland to verify the location of his principal address. On May 3, 2002, Mr. Sweetland wrote to Ms. Scaffidi in response to that inquiry. A. copy of this letter is attached to this memorandum as Exhibit 2. The first sentence of the letter states: "[t]his letter is in follow up to our conversation last week during which you expressed your concern that I was a Virginia attorney attempting to circumvent the Local Rules' membership requirements." As can be seen by examining Exhibit 2, the letterhead lists Mr. Sweetland's address as 2315 40th place, N.W. Suite 304, Washington D.C. 20007. The final paragraph of Mr. Sweetland's letter states that his

> principal address is set forth above [referring to the Washington D.C. address]. That address is located in the District of Columbia. I also use an address within Arlington, Virginia. The Virginia address is the address of HQ Global Workplaces, a company which rents temporary office space[.]

Exh. 2.

If, as Mr. Sweetland has asserted to this Court under penalty of perjury in his re-newal application and represented to it in his May 3, 2002 letter, his principal law office is in Washington, D.C., it is difficult to fathom why all pleadings signed by him and all correspondence sent reflects the Virginia office. Further, faxes sent to my chambers from Mr. Sweetland in this case reflect that they were sent from the Virginia office, area code 703, not the Washington D.C. office, area code 202. It also is puzzling that the web site for the District of Columbia bar lists Mr. Sweetland's office at the Arlington, Virginia address. Given these inconsistencies, I also am referring to the disciplinary committee of this Court the question of whether Mr. Sweetland has been candid in his communications to the clerk's office and truthful in his sworn statements filed in his renewal application regarding the location of his principal law office.[18]

While the phrase "principal law office" is not defined in Local Rule 701, it must be interpreted in a common sense way. If the phrase is to have any meaning at all, it must require that the attorney's principal law office be the place where the attorney actually conducts more than a symbolic practice of law. It may be, following a full investigation, that Mr. Sweetland's principal law office is in Washington, D.C. after all. If not, it is within the discretion of the disciplinary committee to determine what, if any, disciplinary or other proceedings are appropriate to address this issue.

## C. Evidence Rule 408

■ Mr. Sweetland's final argument is that the untruths stated to Defendants' counsel were communicated in a letter specifically written under the auspices of

---

**18.** While the committee is free to conduct this inquiry however it sees fit, questions that logically would be relevant include: (1) In litigation filed by Mr. Sweetland in the last few years, what address has he used on those pleadings? (2) What type of building is 2315 40th Place, N.W.—is it a private apartment building or an office building or suite? (3) Where does Mr. Sweetland interview clients, take depositions, employ clerical assistants, etc.? (4) In the appeals that he has handled in the Fourth Circuit, what address did he use as his office?

Evid. Rule 408 and made in furtherance of the compromise of disputed claims and therefore are inadmissible for "any procedural or substantive purpose" including consideration by the Court in connection with the pending sanctions issue. The rule, its commentary, the relevant case law, learned treatises, and common sense demonstrate why Mr. Sweetland is wrong.

For purposes of this case, Evid. Rule 408 may be restated as follows, with emphasis added: Evidence of conduct or statements made in compromise negotiations for claims that are disputed as to either validity or amount are not admissible *to prove liability or invalidity of the claim,* but not inadmissible if offered for some *other purpose, such as* proving *bias* or *prejudice of a witness, negativing a contention of undue delay,* or *proving an effort to obstruct a criminal investigation or prosecution.*[19] The sole prohibition in the rule is the use of settlement statements for the purpose of proving the validity/invalidity or the amount of a disputed claim and use of this evidence for any other relevant and otherwise admissible purpose is permitted. The listed examples of permissible use are illustrative and not exclusive. The commentary to the rule succinctly reinforces this restatement:

> The final sentence of the rule serves to point out some limitations upon its applicability. Since the rule excludes only when the purpose is proving the validity

of invalidity of the claim or its amount, an offer for another purpose is not within the rule.

556 F.R.D. 227 (1972).

The location of the rule in chapter 4 of the rules of evidence also is no accident. This chapter deals with "relevance and related matters" and is broken down into three broad categories of rules. The first category is a collection of rules dealing with general concepts of relevance, prejudice, and admissibility of evidence (Evid. Rules 401–403). Then there are two rules that deal with the introduction of character evidence (Evid. Rules 404–405). Finally, there are ten rules, all of which are specialized applications of the concept of the relevance/prejudice analysis applicable to specific types of frequently recurring subjects including: habit and custom (Evid. Rule 406); subsequent remedial measures (Evid. Rule 407), offers of compromise of disputed claims (Evid. Rule 408); offers of payment of medical and related expenses (Evid. Rule 409); plea negotiations in criminal cases (Evid. Rule 410); evidence of the existence of liability insurance (Evid. Rule 411); evidence of prior sexual conduct and predisposition of a victim in sexual misconduct cases (Evid. Rule 412); and evidence of prior acts by the defendant in criminal and civil cases dealing with sexual assault and child molestation (Evid. Rules 413–415).

Collectively, these rules demonstrate the general concept set forth in Evid. Rule 105[20]: evidence is not "admissible" or "in-

**19.** Evid. Rule 408 specifically states:
Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely

because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, proving an effort to obstruct a criminal investigation or prosecution.

**20.** Evid. Rule 105 states:
Limited Admissibility.
When evidence which is admissible as to one party or for one purpose but not admis-

admissible" as if occupying some never-changing solid, liquid, or gas-like physical state governed by an inflexible disjunctive natural law, but instead is admissible or inadmissible, *depending on the purpose for which it is offered.* The case law, in this Circuit and elsewhere, confirms this fact with respect to Evid. Rule 408. *See, e.g., Bankcard America, Inc. v. Universal Bancard Systems, Inc.,* 203 F.3d 477, 484 (7th Cir.), *cert. denied,* 531 U.S. 877, 121 S.Ct. 186, 148 L.Ed.2d 128 (2000) ("Rule 408 is not an absolute ban on all evidence regarding settlement negotiations. The rule permits evidence that is otherwise discoverable or that is offered for a purpose other than establishing liability."); *Freidus v. First Nat'l Bank,* 928 F.2d 793 (8th Cir. 1991) (for rebuttal); *County of Hennepin v. AFG Indus., Inc.,* 726 F.2d 149, 153 (8th Cir.1984) (for impeachment); *United States v. Hauert,* 40 F.3d 197, 199–200 (7th Cir.1994) (to show defendant's knowledge and intent); *Johnson v. Hugo's Skateway,* 949 F.2d 1338, 1342, 1346, *on rehearing* 974 F.2d 1408 (4th Cir.1992) (to show intent or motive); *Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356, 1362–66 (10th Cir.1987) (to show a course of reckless conduct); *see also* 1 Michael H. Graham, *Handbook of Federal Evidence* § 408.1 (5th ed.2001); 23 Charles Alan Wright & Kenneth W. Graham, Jr. *Federal Practice and Procedure* § 5311 (1980 & Supp.2002).

Finally, a common sense example further underscores the fallacy in Mr. Sweetland's logic. If he were correct, then the lawyer for the defendant in a sexual harassment case could include with complete impunity as a last sentence in a written settlement offer the statement that "This offer represents the defendant's final offer, and, if it is not accepted, then the defendant will be shot immediately." To

suggest that this result would be condoned by Evid. Rule 408 is absurd.

For those who see within Evid. Rule 408 the reflection of their own ingenuity at having discovered a means to lie, threaten, or coerce with impunity to negotiate a settlement advantageous to their clients, the sanctuary they perceive is illusory. The rule itself, on its face and interpreted as it must be—under Evid. Rule 102 to obtain a fair and just result—allows no such use. Nor will the courts allow a rule intended to promote the fair resolution of disputes to be perverted by a use that would undermine the very reason for its existence. Accordingly, the disciplinary committee of this Court is asked to investigate Mr. Sweetland's conduct in connection with the settlement letter and take any appropriate action based on the outcome of that investigation.

### D. Calculation of Sanction Under Rule 37(b).

Defendants seek a Total of $5,361.00 in fees associated with the motion to compel Mr. Sweetland's deposition, $8,502.00 associated with the taking of his deposition, and costs of $992.25, for a grand total of $14,855.25. As explained below, the Court will award $7,657.00 as reasonable attorneys' fees and $992.25 in costs for a total of $8,649.25 to be paid personally by Mr. Sweetland within thirty days.

Defendants billed the following time for the following attorneys in connection with the motion to compel the deposition of Mr. Sweetland and the taking of the deposition itself ("the Motion"): (1) Ms. Ava Lias–Booker (admitted more than eight years—29.2 hours at $345/hr. or $10,074.00); (2) David E. Ralph (admitted more than five but less than eight years–14.0 hours at $220.00/hr or $3,080.00); (3) Jennifer B.

sible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

Speargas (admitted less than five years, .6 hours at $175/hr. or $105.00); (4) John Ki (admitted less than five years, 1.3 hours at $175.hr. or $227.50); and (5) Paralegal Gina M. Trasatti (13 years experience, 3.5 hours at $120/hr. or $420.00).

Defendants provided a detailed chart itemizing these billings. The Court has reviewed it for reasonableness under Rule 37(b). The Court finds that it is not reasonable to have four attorney time keepers billing on the motion and deposition, neither of which was especially difficult given the prior rulings of the Court. Therefore all of Ms. Speargas' and Mr. Ki's time will be eliminated. Further, the total hours billed by Ms. Lias–Booker—29.2—are excessive, and the fees sought for her time will be reduced by fifty percent to $5,037.00. Mr. Ralph's time also will be reduced by 4.0 hours to a total of $2,200.00. All of Ms. Trasatti's time is reasonable, totaling $420.00. The $992.25 in costs sought are reasonable. The total award therefore is $7,657.00 in fees and $992.25 in costs, for a grand total of $8,649.25. As explained, they are to be assessed against Mr. Sweetland personally.

\*　　\*　　\*　　\*　　\*　　\*

Accordingly, the sanctions and actions referred to at pages one and two above are ordered.